**HANNI M. FAKHOURY**
California Bar No. 252629
**CANDIS MITCHELL**
California Bar No. 242797
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Hanni_Fakhoury@fd.org

Attorneys for Mr. Cayetano-Camacho

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JANIS L. SAMMARTINO)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>**GUADENCIO CAYETANO-CAMACHO**,<br>Defendant. | CASE NO.: 07CR3267-JLS<br><br>STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS |

**I.**

**STATEMENT OF FACTS**

According to the discovery provided by the government, at 9:17 p.m. on November 18, 2007, Border Patrol Agent Erick Cortez was patrolling Marron Valley in Dulzura, California. This area is approximately 7 miles west of the Tecate, California port of entry and 2 miles north of the international border between Mexico and the United States. Agent Cortez observed four individuals walking through the Marron Valley and approached the individuals, identifying himself as a Border Patrol agent in both Spanish and English. Without being given Miranda warnings, all of the individuals, including the defendant Mr. Cayetano-Camacho, stated they did not possess documents allowing them to enter into the U.S. legally. All were arrested and taken to the Brown Field Border Patrol Station for processing.

Five and a half hours later, at 2:50 a.m., Border Patrol Agent Antonio Hurtado advised Mr. Cayetano-Camacho of his consular notification rights as well as his Miranda rights. Mr. Cayetano-Camacho stated he

wanted to speak with a consulate official but that he was unwilling to answer any questions without the presence of an attorney. At 10:30 a.m., Mr. Cayetano-Camacho was given the opportunity to call the Mexican consulate and spoke with an official.

On December 4, 2007, Mr. Cayetano-Camacho was indicted for being a deported alien found in the United States, in violation of 8 U.S.C. § 1326. The indictment alleged that Mr. Cayetano-Camacho was removed from the U.S. subsequent to March 28, 2007. On December 17, 2007, Mr. Cayetano-Camacho filed a motion to compel discovery and dismiss the indictment for failure to allege the essential elements of 8 U.S.C. § 1326. On December 20, 2007, Mr. Cayetano-Camacho filed a motion to dismiss the indictment for grand jury violations.

On January 28, 2008, Mr. Cayetano-Camacho's attorney was given an opportunity to view his immigration A-file.[1] It appears that Mr. Cayetano-Camacho first entered the United States in 1988. In 1989, deportation proceedings were initiated against Mr. Cayetano-Camacho and he was deported pursuant to section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), which provides for the deportation of any alien "present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General." INA § 212(a)(6)(A)(i) (codified at 8 U.S.C. § 1182(a)(6)(A)(i)). Mr. Cayetano-Camacho was removed from the United States but reentered sometime after that. In June 2007, Mr. Cayetano-Camacho's previous deportation was reinstated and he was deported again for being inadmissible. The government now relies on the June 2007 reinstatement of the 1989 deportation to prosecute Mr. Cayetano-Camacho for illegal reentery.

## II.

## THE INDICTMENT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE A SPECIFIC, POST-CONVICTION DATE OF REMOVAL

The Fifth Amendment requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . ." Consistent with this

---

[1] Mr. Cayetano-Camacho has not yet received a photocopy of the contents of his A-file or any audio cassettes or transcripts from his deportation proceedings despite repeated requests for the government to provide them to the defense. Defense counsel intends to supplement and amend this motion when the government complies with his discovery requests.

Constitutional requirement, the Supreme Court has held that an indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." United States v. Carll, 105 U.S. 611, 612-13 (1881). It is black letter law that an indictment that does not allege an element of an offense, even an implied element, is defective, and should be dismissed. See, e.g., Russell v. United States, 369 U.S. 749, 769-72 (1962); Stirone v. United States, 361 U.S. 212, 218-19 (1960); United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999); United States v. Keith, 605 F.2d 462, 464 (9th Cir. 1979).

The 9th Circuit has recently held that an indictment alleging a violation of 8 U.S.C. §1326 must allege both "the dates of a previous felony conviction and of a previous removal from the United States, subsequent to that conviction." United States v. Salazar-Lopez, 506 F.3d 748, 749-750 (9th Cir. 2007). In Salazar-Lopez, the indictment charged the defendant with a violation of § 1326 but "did not allege that Salazar-Lopez had been previously removed subsequent to a felony conviction, nor did it allege a specific date for Salazar-Lopez's prior removal." Id. at 750. The 9th Circuit unequivocally held that the indictment "required" an allegation that the defendant "had been removed on a specific, post-conviction date." Id. at 751.

Here, the indictment fails to allege that Mr. Cayetano-Camacho "had been removed on a specific, post conviction date." Instead, the indictment only says that Mr. Cayetano-Camacho "was removed from the United States subsequent to March 28, 2007." The indictment completely fails to mention Mr. Cayetano-Camacho's prior conviction and a specific date of deportation after that conviction. This is insufficient under Salazar-Lopez and therefore the indictment must be dismissed.[2]

//

//

//

//

---

[2] Mr. Cayetano-Camacho also incorporates by reference the arguments made in his December 17, 2007 motion to dismiss the indictment for failure to allege the essential elements of 8 U.S.C. § 1326. He recognizes that those arguments have been foreclosed by United States v. Rivera-Sillas, 376 F.3d 887 (9th Cir. 2004) but raises them to preserve the issue for further appeal.

## III.

## THE INDICTMENT MUST BE DISMISSED BECAUSE IT RELIES ON AN INVALID DEPORTATION

"In a criminal prosecution under § 1326, the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation. United States v. Zarate-Martinez, 133 F.3d 1194, 1197 (9th Cir. 1998). Because a removal order is an element of the crime of illegal reentry after deportation, Mr. Cayetano-Camacho has a Fifth Amendment right to collaterally attack his removal order. United States v. Mendoza-Lopez, 481 U.S. 828, 837-838 (1987). As the Supreme Court has said, "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." Mendoza-Lopez, 481 U.S. at 837-838; see also United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1047-48 (9th Cir. 2004) (citing Zarate-Martinez, 133 F.3d at 1197 and Mendoza-Lopez, 481 U.S. at 837-838).

Under 8 U.S.C. § 1326(d), to successfully collaterally attack a deportation, a defendant must demonstrate: (1) exhaustion of all administrative remedies available to appeal the removal order; (2) the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and (3) that the entry of the order was fundamentally unfair. See Ubaldo-Figueroa, 364 F.3d at 1048. "An underlying removal order is 'fundamentally unfair' if: (1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (citing Zarate-Martinez, 113 F.3d at 1197) (internal brackets omitted). Because Mr. Cayetano-Camacho can meet all of these elements, the indictment must be dismissed.

### A. Mr. Cayetano-Camacho Is Excused From The Exhaustion Requirement Because His Waiver Of The Right To Appeal Did Not Comport With Due Process

The exhaustion and judicial review requirements of § 1326(d) cannot bar collateral review of a deportation proceeding when the waiver of the right to an administrative appeal did not comport with due process. Ubaldo-Figueroa, 364 F.3d at 1043 (citing United States v. Muro-Inclan, 249 F.3d 1180, 1189 (9th Cir. 2001), cert. denied, 534 U.S. 879 (2001)). A waiver does not comport with due process if it is not considered and intelligent. Ubaldo-Figueroa, 364 F.3d at 1043 ; see also Mendoza-Lopez, 481 U.S. at 840

("Because the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding.").

An alien's waiver of his right to appeal his deportation order is not "considered and intelligent" if the alien is (1) not *personally* informed of his right to appeal; or (2) where the immigration judge ("IJ") fails to advise the alien of the possibility of relief from deportation. Ubaldo-Figueroa, 364 F.3d at 1049 ("An alien can not make a valid waiver of his right to appeal a removal order if an IJ does not expressly and personally inform the alien that he has the right to appeal."). Moreover, it is the government's burden to establish by "clear and convincing evidence," Gete v. INS, 121 F.3d 1285, 1293 (9th Cir.1997), that the waiver is "considered and intelligent." United States Lopez-Vasquez, 1 F.3d 751, 753-54 (9th Cir. 1993) (en banc); see also United States v. Gonzalez Mendoza, 985 F.2d 1014, 1017 (9th Cir. 1993) (finding a due process violation where IJ failed to inquire whether right to appeal was knowingly and voluntarily waived).

Here, Mr. Cayetano-Camacho's waiver of the right to appeal at both his 1989 and 2007 deportation proceedings did not comport with due process and therefore his failure to exhaust is excused.

**1. Mr. Cayetano-Camacho Was Not Personally Informed Of The Right To Appeal At Both His 1989 and 2007 Deportation Hearings**

Mr. Cayetano-Camacho's due process rights were violated because he was not personally informed of his right to appeal at either of his deportation proceedings. Ubaldo-Figueroa, 364 F.3d at 1049-50. The 9th Circuit has forcefully stated that it has "*never* held that due process is satisfied by a mass silent waiver of the right to appeal a deportation order." United States v. Lopez-Vasquez, 1 F.3d 751, 754 (9th Cir. 1993) (en banc) (emphasis added) (alien's waiver of the right to appeal was not "considered and intelligent" even though IJ thoroughly explained the right to appeal at a group hearing because failing to solicit separate responses conveyed the message individuals would not benefit from an appeal).

The colloquy between the IJ and Mr. Cayetano-Camacho will almost certainly show that any purported waiver was not "considered and intelligent."[3] As has been amply documented, IJ advisals are

[3] Again, as indicated earlier, despite repeated requests, the government has not yet provided Mr. Cayetano-Camacho with copies of the audiotapes of his 1989 or 2007 deportation hearings. For the purposes of this motion, with respect to Mr. Cayetano-Camacho's 1989 deportation hearing, he does not remember the IJ soliciting an individualized and informed waiver from him. He assumes that the IJ's colloquy with him was typical of those that occurred prior to the Supreme Court's decision in INS v. St. Cyr, 533 U.S. 289

often inadequate. Prior to the Supreme Court's decision in INS v. St. Cyr, 533 U.S. 289 (2001), most advisals consisted of the IJ addressing the individuals as a group and informing the group that they had a right to appeal to the Board of Immigration Appeals. At most, the IJ would note that those rights were more fully explained on the back of the list of legal service providers without ever inquiring whether each person in the group had personally received the list and was personally aware of his appellate rights. See e.g. United States v. Pallares-Galan, 359 F.3d. 1088, 1098 (9th Cir. 2004) (no express or implied waiver where IJ asked alien if he wished to appeal and alien stated that "[i]t would be better if I leave my children, that's fine" (emphasis removed)); Zarate-Martinez, 133 F.3d at 1198 (conversation with petitioner where IJ asked, "do you understand your rights?" and petitioner responded "yes," not an express or implied "voluntary or intelligent" waiver of the right to appeal, even though IJ had previously informed the group that they would have the right to appeal).

The IJ in both his 1989 and 2007 proceedings did not personally inform Mr. Cayetano-Camacho of his right to appeal, offer an explanation of what an appeal was or inquire as to whether Mr. Cayetano-Camacho knew what an appeal was. Moreover, the government has not produced the recording of Mr. Cayetano-Camacho's 1989 or 2007 deportation proceedings and thus, cannot meet its burden of proving by clear and convincing evidence that any waiver of Mr. Cayetano-Camacho's right to appeal was "considered and intelligent." Therefore, Mr. Cayetano-Camacho is exempt from the exhaustion and judicial review requirements of § 1326(d) and he can collaterally attack the validity of his prior deportations.

**2. Mr. Cayetano-Camacho Was Not Informed Of Potential Grounds For Relief At Both His 1989 and 2007 Deportation Hearings**

An alien's waiver of the right to appeal his deportation order is not "considered and intelligent when the record contains an inference that the petitioner is eligible for relief from deportation, but the [IJ] fails to 'advise the alien of this possibility and give him the opportunity to develop the issue." Ubaldo-Figueroa, 364 F.3d at 1049 (internal quotations omitted). Furthermore, the "requirement that the [IJ] inform an alien of his or her ability to apply for relief from removal is 'mandatory,' and '[f]ailure to so inform the alien [of

---

(2001). The same due process violations occurred during his 2007 deportation hearing. Mr. Cayetano-Camacho will supplement and amend this motion when the government complies with his discovery requests.

his or her eligibility for relief from removal] is a denial of due process that invalidates the underlying deportation proceeding.'" Id. (quoting United States v. Muro-Inclan, 249 F.3d 1180, 1183 (9th Cir. 2001). See also United States v. Arrieta, 224 F.3d 1076, 1079 (9th Cir.2000) (finding due process violation because IJ failed to tell the defendant about his eligibility for waiver of deportation); United States v. Arce-Hernandez, 163 F.3d 559, 563 (9th Cir. 1998) (same).

Though Mr. Cayetano-Camacho was eligible for relief at both his 1989 and 2007 deportation proceedings, it is likely that he was not advised of his eligibility.

**a. Mr. Cayetano-Camacho Was Eligible For Voluntary Departure In 1989**

Section 244(e) of the INA in effect in 1989 stated "the Attorney General may, in his discretion, permit any alien under deportation proceedings ... to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character...." See 8 U.S.C. § 1254(e) (1982); see also Cunanan v. I.N.S., 856 F.2d 1373, 1374 (9th Cir. 1988). Since the IJ likely failed to advise Mr. Cayetano-Camacho that he was eligible for voluntary departure, his waiver of the right to appeal was not "considered and intelligent" and excuses the requirement of the exhaustion of administrative remedies.

**b. Mr. Cayetano-Camacho Was Eligible For Voluntary Departure In 2007**

Under the law in place when Mr. Cayetano-Camacho went in front of an IJ again in 2007,

> The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 1229a of this title or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) [8 U.S.C. § 1227(a)(2)(A)(iii)] or section 237(a)(4)(B) [8 U.S.C. § 1227(a)(4)(B)] of this title.

INA § 240B(a)(1), 8 U.S.C. § 1229c(a)(1). The sections of the INA referenced in the text of § 240B allows the government to deport an alien convicted of an aggravated felony or terrorism offense. So an alien removed on any ground other than being convicted of an aggravated felony or a terrorism offense is eligible for voluntary departure.

Just as he was eligible in 1989 under then existing law, Mr. Cayetano-Camacho was again eligible for voluntary departure under the current version of the INA. As evidenced by the July 13, 2007, Warrant of Removal and Warning to Alien Removed, Mr. Cayetano-Camacho was charged with being removable because he was not properly admitted, under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). See

Exhibits A and B.[4] Again, since the IJ likely failed to advise Mr. Cayetano-Camacho of his eligibility for relief in 2007, his waiver of the right to appeal was not "considered and intelligent" and thus the need to exhaust his administrative remedies is excused.

The government may attempt to argue that because Mr. Cayetano-Camacho was convicted of an aggravated felony on March 28, 2007, specifically a violation of California Penal Code § 288, Lewd and Lascivious Acts With a Child Under 14, he was not eligible for voluntary departure. But the statute makes clear that this argument is incorrect. Section 240B(a)(1) of the INA, 8 U.S.C. § 1229c(a)(1), explains that all aliens are eligible for voluntary departure unless "deportable" for being convicted of an aggravated felony. Here, the alleged ground for Mr. Cayetano-Camacho's 2007 removal was that he was inadmissible since he was not properly admitted under INA § 212(a)(6)(A)(i). He was never alleged to be deportable for committing an aggravated felony as clearly indicated by the Warrant of Removal and Warning to Alien removed, which specifically reference INA § 212(a)(6)(A)(i), not INA § 237(a)(2)(A)(iii) which deals with removing aliens for committing aggravated felonies. See Exhibits A and B. Furthermore, the 2007 deportation was a reinstatement of Mr. Cayetano-Camacho's 1989 removal order, which was prior to his California state conviction.[5]

Because Mr. Cayetano-Camacho was eligible for voluntary departure in his 2007 proceeding and because it is likely that the IJ did not advise him of the possibility of relief, the need to exhaust his administrative remedies is excused because the waiver of his right to appeal was not "considered and intelligent."

**B. The 1989 and 2007 Removal Proceedings Improperly Deprived Mr. Cayetano-Camacho Of The Opportunity For Judicial Review**

As explained in detail above, Mr. Cayetano-Camacho did not make a "considered and intelligent" waiver of his appellate rights. He was likely not personally informed of the right to appeal and what an appeal meant, nor informed of his potential eligibility for relief from deportation. The 9th Circuit has held

---

[4] These documents were the only immigration documents provided to the defense in discovery. The Notice to Appear also indicates § 212(a)(6)(A)(i) was the basis of Mr. Cayetano-Camacho's 2007 deportation. That document was contained in the A-File but defense counsel has not received a copy of it.

[5] Mr. Cayetano-Camacho's only conviction is the 2007 California state conviction.

that the failure to inform an alien of their appeal rights satisfies the judicial review prong of § 1326(d)(2). Ubaldo-Figueroa, 364 F.3d at 1050 (citing Zarate-Martinez, 133 F.3d at 1197); see also Mendoza-Lopez, 481 U.S. at 840 ("Because the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding."). Therefore the invalid appellate waiver - as well as the failure to advise Mr. Cayetano-Camacho of his eligibility for relief - not only excuses the exhaustion requirement, but also demonstrates that the proceedings deprived him of meaningful judicial review.

**C. The Removal Order Was Fundamentally Unfair Because It Violated Mr. Cayetano-Camacho's Right To Due Process And Prejudiced Him**

As noted above, "[a]n underlying removal order is 'fundamentally unfair' if: (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (quoting Zarate-Martinez, 133 F.3d at 1197).

**1. Mr. Cayetano-Camacho's Due Process Rights Were Violated At Both Deportation Proceedings**

Again, as described in detail above, at both of Mr. Cayetano-Camacho's deportation proceedings his appellate waiver was not "considered and intelligent" and therefore violated his right to due process. See Ubaldo-Figueroa, 364 F.3d at 1043; see also Mendoza-Lopez, 481 U.S. at 840 ("Because the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding.").

**2. Mr. Cayetano-Camacho Was Prejudiced Because He Could Have Applied For Relief Had He Known He Was Eligible**

To establish prejudice, Mr. Cayetano-Camacho does not have to show that he would have been granted relief. Instead, he need only show that he had a "'plausible' ground for relief from deportation." Ubaldo-Figueroa, 364 F.3d at 1050 (citing Arrieta, 224 F.3d at 1079). As the Ninth Circuit has explained, prejudice means that "the outcome of the proceedings *may have been affected* by the alleged violation." Zolotukhin v. Gonzales, 417 F.3d 1073, 1076 (9th Cir. 2005) (emphasis in original). "The standard does not demand absolute certainty; rather prejudice is shown if the violation '*potentially* . . . affects the outcome

of the proceedings.'" Id. at 1077 (citing Agyeman v. INS, 296 F.3d 871, 884 (9th Cir. 2002)) (emphasis in original). For example, in Zolutukhin the government argued that the petitioner lacked good character and thus would not have been able to prevail on his claims. Zolutukhin, 417 F.3d at 1077. The Ninth Circuit rejected this argument, noting that "even a petitioner with purportedly bad character and possibly a weak case has a right to a fair hearing." Id. Because the outcome of the case may have been different absent the due process violations, the case was remanded for a new hearing. Id.

Mr. Cayetano-Camacho was clearly eligible for voluntary departure in both 1989 and 2007. Under the 1989 requirements, he needed to show that he had the will and ability to depart the U.S. and pay his own passage as well as have good moral character for the proceeding five years. If Mr. Cayetano-Camacho had been notified of the potential for relief, he could have applied and likely would have been granted voluntary departure. With respect to Mr.Cayetano-Camacho's character in 1989, there was nothing in the A-file to suggest he did not have "good moral character." In any event, even the 9th Circuit has noted that someone with "bad character" and a "weak case" is entitled to a fair hearing. The 2007 requirements were similar to the 1989 requirements, eliminating the requirement for good moral character and instead requiring an alien not be deportable for having been convicted of an aggravated felony or a terrorism offense. As explained above, the government did not claim that Mr. Cayetano-Camacho was deportable for being convicted of an aggravated felony and did not remove him on that ground. Therefore he was eligible for voluntary departure and could have been granted that relief. Because the IJ did not advise him of his eligibility for that form of relief in 1989 or 2007, the defects in the deportation proceedings prejudiced Mr. Cayetano-Camacho.

Because Mr. Cayetano-Camacho is exempt from the exhaustion requirement, because the underlying removal proceedings at which his deportation order was issued improperly deprived him of the opportunity for judicial review and because the entry of the orders were fundamentally unfair since he was deprived of due process and prejudiced as a result, the indictment must be dismissed.[6]

//

---

[6] Even if this court were to reject Mr. Cayetano-Camacho's attack on his 2007 deportation proceeding, because that proceeding involved the reinstatement of the 1989 deportation and because the 1989 deportation was fundamentally unfair and violated the due process clause, the 2007 proceeding must also be deemed unfair since it relied on the unfair 1989 proceeding.

**IV.**

**THE STATEMENTS MUST BE SUPPRESSED UNDER MIRANDA AND A HEARING AS TO THE VOLUNTARINESS OF THE STATEMENTS MUST BE HELD**

**A. The Government Must Demonstrate That Mr. Cayetano-Camacho's Field Statements To Agent Cortez Were Given After He Knowingly And Voluntarily Waived His Miranda Warnings**

**1. Miranda Warnings Must Precede Custodial Interrogation**

It is well known that before a defendant in custody can be questioned about alleged criminal activity, he must be given warnings under Miranda v. Arizona, 384 U.S. 436 (1966). Miranda explained that "when the person being interrogated is 'in custody at the station or otherwise deprived of his freedom of action in any significant way,'" warnings are required. Orozco v. Texas, 394 U.S. 324, 327(1969) (quoting Miranda, 384 U.S. at 477). A suspect is in custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe that he could not freely leave. See United States v. Lee, 699 F.2d 466, 468 (9th Cir. 1982); United States v. Bekowies, 432 F.2d 8, 12 (9th Cir. 1970). Although questions regarding routine biographical information usually do not trigger the safeguard of Miranda, the exception does not apply "where the elicitation of information regarding immigration status is reasonably likely to inculpate the [suspect]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990). In fact, because of the close relationship between civil and criminal immigration investigations, "[c]ivil as well as criminal interrogation of in-custody defendants by INS investigators should generally be accompanied by the Miranda warnings." United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir. 1983).

In determining whether an individual is in custody for purposes of Miranda, the 9th Circuit has instructed courts to consider "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002) (citations omitted). The same considerations apply in the context of custody at the border. See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980). Furthermore, questions by agents implying a person is suspected of criminal activity can give rise to a reasonable belief that one is not free to leave and thus turn an encounter with law enforcement into custody

for purposes of Miranda. United States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001). A person does not need to be physically restrained to be in "custody." The 9th Circuit has found that an individual questioned out in an open field, neither handcuffed or told he was under arrest, to be in custody for purposes of Miranda. United States v. Beraun-Panez, 812 F.2d 578, 579 (1987). In that case, the court held that "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding." Id. at 580.

Mr. Cayetano-Camacho was clearly in custody. Although the Border Patrol report does not contain the specific language used by the officers to "summon" Mr. Cayetano-Camacho, the report explains that Agent Cortez identified himself as a Border Patrol Agent. Considered with the fact that Agent Cortez was in uniform, carrying a gun and in an isolated area near the Mexican border it is clear that Mr. Cayetano-Camacho knew he was in the custody of law enforcement. Further, Mr. Cayetano-Camacho was confronted with evidence of his guilt immediately as Agent Cortez began questioning him about his citizenship and nationality, the precise elements of the crime he was suspected of committing, illegal reentry in violation of 8 U.S.C. § 1326. The physical surrounding of the interrogation - an open field close to the Mexican border - considered with the questioning by a clearly identified Border Patrol agent demonstrates that Mr. Cayetano-Camacho was suspected of criminal activity and thus in custody. See Chavez-Valenzuela, 268 F.3d at 725. Because Mr. Cayetano-Camacho was in custody when he was questioned, any questioning must have been preceded by Miranda warnings.

**2. The Government Must Prove That Any Waiver Of Miranda Rights Was Voluntary, Knowing and Intelligent**

Based on the discovery provided to the defense, Mr. Cayetano-Camacho's field interrogation was not preceded by any Miranda warnings and yet a statement was taken. As the Supreme Court has made clear, when "interrogation continues without the presence of an attorney, and a statement is taken, a *heavy* burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475 (emphasis added) (citation omitted). It is undisputed that any waiver of the right to remain silent and the right to counsel must be made knowingly, intelligently, and voluntarily in order to be effective. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). The standard of proof for a waiver of this constitutional right is in the

Supreme Court's own words "high." Miranda, 384 U.S. at 475; see also United States v. Heldt, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is "great" and the court "must indulge every reasonable presumption against waiver of fundamental constitutional rights").

The validity of the waiver depends upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. Edwards v. Arizona, 451 U.S. 477 (1981); Johnson v. Zerbst, 304 U.S. 458, 464 (1938); see also Heldt, 745 F.2d at 1277. The 9th Circuit has explained that a Miranda waiver must be both (1) voluntary, and (2) knowing and intelligent." Derrick v. Peterson, 924 F.2d 813, 820 (9th Cir. 1990), cert. denied, 502 U.S. 853 (1991). The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry under the [Fifth] Amendment . . . ." Id. However, the second prong, requiring that the waiver be "knowing and intelligent," requires an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id. at 820-21 (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)). This Court must therefore determine whether "the requisite level of comprehension" existed before any purported waiver may be upheld. Derrick, 924 F.3d at 820. Thus, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. (quoting Spring, 479 U.S. at 573) (emphasis in original) (citations omitted).

Therefore, unless the government demonstrates that the agents gave Mr. Cayetano-Camacho Miranda warnings before he made a statement and that he voluntarily, knowingly and intelligently waived those rights before giving a statement, no evidence obtained as a result of the interrogation can be used against him. Miranda, 384 U.S. at 479. Since Mr. Cayetano-Camacho was placed into Border Patrol custody and was immediately questioned directly about his citizenship and immigration status without any Miranda warnings, any and all statements must be suppressed. See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980).

**B. The Government Must Prove That Mr. Cayetano-Camacho's Statements Were Voluntary**

**1. A Statement Must Be Voluntary To Comply With The Due Process Clause**

Even if a statement is preceded by Miranda warnings, the due process clause prohibits the use of involuntary statements. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387

(1964). The government bears the burden of proving by a preponderance of the evidence that any confession or statements were voluntarily made by a criminal defendant. Lego v. Twomey, 404 U.S. 477, 483 (1972). A statement is voluntary if it is the product of a rational intellect and free will. Blackburn v. Alabama, 361 U.S. 199, 208 (1960).

As the Supreme Court has explained, in determining whether a statement is voluntary, courts must look at the totality of the circumstances, taking into account factors such as "the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (citations omitted). A statement or confession will be involuntary if coerced by either physical intimidation or psychological pressure. A confession is deemed involuntary not only if coerced by physical intimidation, but also if achieved through psychological pressure. "The test is whether the confession was 'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (per curiam) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Accord United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

### 2. This Court Must Hold A Hearing Under 18 U.S.C. § 3501 To Determine Whether Mr. Cayetano-Camacho Statements Were Voluntary

Under 18, U.S.C. § 3501(a), "[b]efore [a] confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." This Court is thus required to determine whether any statements made by Mr. Cayetano-Camacho were voluntary. Additionally, 18 U.S.C. § 3501(b) requires this Court to consider numerous enumerated factors in determining whether Mr. Cayetano-Camacho voluntarily made a statement. These factors include whether he understood the nature of the charges against him and whether he understood his constitutional rights.

Section 3501(a) clearly requires this Court to make a factual determination. When a factual determination is required, Federal Rule of Criminal Procedure 12 requires the court to make factual findings. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Since "'suppression hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely an

unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings. Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)). Without the presentation of evidence, this Court cannot adequately consider the 18 U.S.C. § 3501(b) factors. Therefore, Mr. Cayetano-Camacho requests this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a) to determine, outside the presence of the jury, whether the statements he made were voluntary.

## V.

## THE COURT MUST EXCLUDE FINGERPRINT EVIDENCE BECAUSE IT IS UNRELIABLE UNDER DAUBERT AND KUMHO TIRE

Mr. Cayetano-Camacho anticipates that the government will seek to introduce an expert to testify about his fingerprints. All fingerprints must be excluded because they fail to meet the criteria for scientific reliability established by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Federal Rule of Evidence 702 requires any testimony regarding "scientific, technical, or other specialized knowledge" to be "reliable." Furthermore, Federal Rule of Evidence 104 requires the court to determine the admissibility of any testimony. In Daubert, the Supreme Court, using Rule 702 as a starting point, held scientific evidence may only be admitted if relevant and reliable. To determine reliability, the court provided four nonexhaustive factors for courts to consider: (1) whether the technique the expert employs is generally accepted in the scientific community; (2) whether it has been subjected to peer review and publication; (3) whether it can be and has been tested; and (4) whether the known or potential rate of error is acceptable compared to operating standards for the technique. In Kumho Tire v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded Daubert to include *all* expert testimony. Thus, regardless of whether fingerprint evidence is treated as scientific or merely the subject of expert testimony, it must satisfy the Daubert factors.

Although in United States v. Sherwood, 98 F.3d 402 (9th Cir. 1996), the Ninth Circuit found that the admission of a fingerprint expert's testimony was not error, there the defendant conceded that the techniques were generally accepted, the opinion was subject to peer review and publication and the testimony would aid the jury in identifying the guilty party. In essence, the defendant conceded to all of the Daubert factors. Here, by contrast, Mr. Cayetano-Camacho makes no such concession; in fact by this motion

Mr. Cayetano-Camacho does the opposite. See, e.g., Margaret A. Berger, "Procedural Paradigms for Applying the Daubert Test," 78 Minn. L.Rev. 1345, 1353 (1994) ("Considerable forensic evidence [such as fingerprinting] made its way into the courtroom without empirical validation of the underlying theory and/or its particular application."); Michael J. Saks, Merlin and Solomon: Lessons from the Law's Formative Encounters With Forensic Identification Science, 49 Hastings L.J. 1069, 1105-06 (1998) (noting that the first courts to recognize the validity of fingerprint analysis "invested little effort assessing the merits of the proffered scientific evidence" and observing that: "Fingerprint evidence may present courts applying Daubert with their most extreme dilemma. By conventional scientific standards, any serious search for evidence of the validity of fingerprint identification is going to be disappointing. Yet the intuitions that underlie fingerprint examination, and the subjective judgments on which specific case opinions are based, are powerful."). As Sherwood made no serious or substantive inquiry into the reliability of fingerprint testimony, it does not bind this Court's consideration of this issue.

**A. This Court Should Exclude Fingerprint Evidence Because Fingerprint "Identification" Is Not Accepted In The Scientific Community**

Fingerprinting is not based on scientific research, but rather the subjective opinions of fingerprint examiners. As the author of the leading forensic science treatise has forcefully stated, a "vote to admit fingerprints is a rejection of conventional science as the criterion for admission." Michael J. Saks, Merlin and Solomon, 49 Hastings L.J. at 1106. In fact, leading forensic scientists have found fingerprint analysis to be scientifically deficient. See Robert Epstein, Fingerprints Meet Daubert: The Myth of Fingerprint "Science" Is Revealed, 75 S. Cal. L. R. 605, 646 (2002) (citing Saks, Merlin and Solomon, 49 Hastings L.J. at 1106). Instead, the only community to express a general acceptance of fingerprint identification has been the fingerprint examiners themselves. Epstein at 646.

The biggest problem with fingerprint evidence is that it serves only to confirm a law enforcement officer's subjective opinion regarding the identity of a suspect. As an alter-ego of the criminal justice system, the lengths to which forensic scientists have been willing to go to provide testimony desired by prosecutors, regardless of the truth, dramatically demonstrates the failure of fingerprint evidence as true science. See Paul Giannelli, The Abuse of Scientific Evidence in Criminal Cases, 4 Va. J. Soc. Pol'y & L. 439 (1997) (proposing that forensic scientists be freed from the pressures that lead to fraud and perjury by removing

crime laboratories from the control of police departments). Rather than attempting to disprove a hypothesis through the scientific method, crime investigators utilizing fingerprint identification seek evidence consistent with a suspect's guilt. See e.g., Paul L. Kirk, Crime Investigation: Physical Evidence and the Police Laboratory 71 (2nd ed. 1974). Put another way, because fingerprinting techniques have been created, developed, and funded by the government - the same entity seeking to imprison a criminal defendant - and because these techniques are dependent upon the subjective examination of law enforcement officers, they are inherently unreliable. As a consequence, fingerprinting has no place as an objective, science-based method of identification in the truth-seeking process of a criminal trial and should be excluded here.

**B. This Court Should Exclude Fingerprint Evidence Because It Has Not Been Subjected To Peer Review**

As the Supreme Court stated in Daubert, "[s]ubmission to the scrutiny of the scientific community is a component of 'good science', in part because it increases the likelihood that substantive flaws in the methodology will be detected." Daubert, 509 U.S. at 594. Contrary to "good science," however, fingerprinting has not been subjected to objective scrutiny by the scientific community. Instead, fingerprinting has only been subjected to "peer review" by other fingerprint examiners and law enforcement officials who have a personal and professional incentive in upholding the validity of fingerprint evidence at any cost. One commentator has noted the "failure of the identification community to challenge or hold meaningful debate." David R. Ashbaugh, Quantitative-Qualitative Friction Ridge Analysis: An Introduction to Basic and Advanced Ridgeology, 4 (1999) (quoted in Epstein at 645). In fact Ashbaugh has likened the fingerprint examiners community to a religion more than a science:

> In the past the friction ridge identification science has been akin to a divine following. Challenges were considered heresy and challengers frequently were accused of chipping at the foundation of the science unnecessarily. This cultish demeanor was fostered by a general deficiency of scientific knowledge, understanding, and self confidence within the ranks of identification specialists. A pervading fear developed in which any negative aspect voiced that did not support the concept of an exact and infallible science could lead to its destruction and the destruction of the credibility of those supporting it.

Ashbaugh, Quantitative-Qualitative Friction Ridge Analysis at 4 (quoted in Epstein at 645). The purpose of peer review - to detect "substantial flaws" and expose error - is glaringly absent in most forensic sciences and particularly in fingerprinting. Daubert, 509 U.S. at 594. Without any showing of reliability of fingerprinting by the scientific community, this Court should exclude all fingerprint evidence here.

**C. This Court Should Exclude Fingerprint Evidence Because It Has Not Been Properly Tested**

Remarkably, in contrast to DNA analysis which has had extensive testing for accuracy and reliability, there have been no studies to determine the accuracy or reliability of fingerprint evidence. Epstein at 622-624. The reason for this is glaringly obvious: fingerprint identification is not a science but a subjective art. The subjective interpretation of fingerprints means that there is no possible way for them to be tested for accuracy or reliability. In fact it was only until the end of the 20th century, prompted by challenges to fingerprint evidence under Daubert in a federal trial in Philadelphia, that the FBI undertook a study to determine the validity of fingerprint analysis. As Saks has commented,

> That fact alone should terrify a court. Why couldn't they bring in the hundreds of studies that ought to exist to support their claims of the past century? Because few were ever done. Because they do not exist. The data were disconcerting - as labs in all 50 states were sent the trial evidence and did not all come back with the same conclusions. The FBI re-sent the evidence to those labs that reached a differing opinion, pointing out what the FBI thought the conclusion should be. The labs changed their minds.

Michael J. Saks, Banishing Ipse Dixit: The Impact of Kumho Tire On Forensic Identification Science, 57 Wash. & Lee L. Rev. 879, 899, n. 108 (2000).

Furthermore, there is no proof that every person's fingerprints are unique. See Harold Cummins & Charles Midlo, Dermatoglyphics 154 (1943) ("It is unfortunate that this approach carries the implication that a complete correspondence of two patterns might occur . . . it is impossible to offer decisive proof that no two fingerprints bear identical patterns."). Accordingly, fingerprint examiners have never been able to calculate the probability that two different people may have a number of similar fingerprint ridges. Fingerprint examiners have no probability models and no probability data to use. See David Stoney, Fingerprint Identification in Modern Scientific Evidence: The Law and Science of Expert Testimony § 21-2.3.1 (David L. Faigman et al. eds., 1997) ("The criteria for absolute identification of an individual through fingerprint comparison are wholly dependent on the professional judgment of a fingerprint examiner. When a fingerprint examiner determines that there is enough corresponding detail to warrant the conclusion of absolute identification, then the criteria have been met.").

In short, this lack of testing for both reliability and probability demonstrates that fingerprint evidence is unreliable and therefore should be excluded from Mr. Cayetano-Camacho's trial.

//

**D. Because Fingerprint Evidence Has No Known Error Rate And No Standards of Operation It Must Be Excluded**

Following from this lack of testing, there has been no established error rate for fingerprint examination. What is well known is that there are many cases of incorrect fingerprint identifications. See e.g., State v. Caldwell, 322 N.W.2d 574 (Minn. 1982) (defendant's murder conviction reversed after it was definitively established that two certified fingerprint experts had erred); see also Kersahw, Sarah and Eric Lichtblau, "Spain Had Doubts Before U.S. Held Lawyer In Blast," *New York Times*, (May 24, 2004) (FBI fingerprint experts wrongly identify fingerprint match in Madrid train bombings); James E. Starrs, A Miscue in Fingerprint Identification: Causes and Concerns, 12 J. of Police Sci. & Admin. 287 (1984). As commentators have recognized, "it is difficult to glean information about cases of error because they rarely produce a public record, and the relevant organizations and agencies tend not to discuss them publicly." Simon A. Cole, Witnessing Identification: Latent Fingerprinting Evidence and Expert Knowledge, 28 Social Studies in Science 687, 701 (Oct.-Dec. 1998). Without a known error rate, the reliability of fingerprint evidence cannot be adequately assessed.

Compounding this problem is the fact that no objective standards control fingerprint interpretation. Different organizations and countries use different standards to determine when a "fingerprint match" is established. See Epstein at 636-637 ("While the official position of the FBI is that there is no basis for a minimum point requirement, many fingerprint examiners in the United States continue to employ either their own informal point standards or standards that have been set by the agencies for which they work. In addition, while there is no uniform identification standard in the United States, many other countries have set such standards."). Instead, whether an identification has been made is left to the subjective judgment of the particular examiner. In fact, David Ashbaugh, a leading fingerprint expert, has opined that a fingerprint examiner's opinion is "very subjective" and that any attempt to create a set of standards would have to be based on "what can best be described as an educated conjecture." Ashbaugh, Quantitative-Qualitative Friction Ridge Analysis at 2; David R. Ashbaugh, The Premises of Friction Ridge Identification, Clarity and the Identification Process, 44 J. Forensic Identification 499, 513 (1994).

Without a known error rate or standards to evaluate the fingerprints in this case, this Court should find that any fingerprint evidence would be unreliable. Admitting such unreliable evidence would violate

Mr. Cayetano-Camacho Fifth Amendment right to due process and Sixth Amendment right to a fair trial. Therefore Mr. Cayetano-Camacho requests this court preclude the introduction of fingerprint evidence at trial. At a minimum, Mr. Cayetano-Camacho requests this Court hold a hearing outside the presence of the jury to establish the reliability of fingerprint methodology under Daubert, Kumho Tire and Federal Rules of Evidence 702 and 104.

**VI.**

**THE COURT MUST HOLD A DAUBERT HEARING WITH RESPECT TO ANY EVIDENCE ABOUT A-FILE RECORD KEEPING**

Mr. Cayetano-Camacho also anticipates the government will call an official from Immigration and Customs Enforcement ("ICE") to testify as to its record keeping and the contents of Mr. Cayetano-Camacho's immigration "A-File." Because Kumho Tire expanded Daubert to cover *all* expert testimony - whether scientific or not - Mr. Cayetano-Camacho also requests a hearing as to the relevance and reliability of any testimony concerning ICE's record keeping and the contents of the A-File.

**VII.**

**MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

***Mr. Cayetano-Camacho has received 56 pages of discovery.*** He has not however received any audiotapes of his deportation proceeding as well as a photocopy of the A-file. As information comes to light, due to the government providing additional discovery in response to these motions or an order of this Court, Mr. Cayetano-Camacho may find it necessary to file further motions. It is, therefore, requested that Mr. Cayetano-Camacho be allowed the opportunity to file further motions based upon information gained through the discovery process. Specifically, because Mr. Cayetano-Camacho's collateral attack on the underlying deportations relies on the audiotapes of the deportation proceedings, he requests the opportunity to file further briefing to support his collateral attack once he has been provided an opportunity to listen to the proceedings.

//

//

//

//

**VIII.**

**CONCLUSION**

For the foregoing reasons, Mr. Cayetano-Camacho respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: February 1, 2008

*s/ Hanni M. Fakhoury*
**HANNI M. FAKHOURY**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Cayetano-Camacho